UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
-------------------------------------------------------------x

RENAISSANCE CARPET AND TAPESTRIES, :
INC.,

                   Plaintiff,   :   No. 09-CV-00632-SRC-MAS

      -against-   :   ELECTRONICALLY FILED

S&H RUGS, INC. and ORI WILBUSH,   :

                  Defendants.   :

-------------------------------------------------------------x

### AFFIDAVIT OF RONALD W. MEISTER IN SUPPORT OF
### MOTION TO PRECLUDE TESTIMONY OF PUTATIVE EXPERT

STATE OF NEW YORK   )
                             ) ss.:
COUNTY OF NEW YORK )

**RONALD W. MEISTER**, Esq., being duly sworn, states:

1. I am a member of the firm of Cowan, Liebowitz & Latman, P.C., attorneys for plaintiff Renaissance Carpet and Tapestries, Inc. ("Renaissance") in the above-entitled copyright infringement action. I submit this affidavit in support of Plaintiff's motion to preclude the testimony of Defendants' proposed expert, David Castriota.

**Background**

2. Renaissance, as alleged in the Amended Complaint, is among the world's leading designers, manufacturers and suppliers of fine handmade

1218708.1

Aubusson and Savonnerie carpets in the French style of the eighteenth and nineteenth centuries. Renaissance's carpets are of the highest quality, and feature new designs in the classic tradition. Its carpets are hand-crafted in China, India and Pakistan, and are widely sold and advertised throughout the United States and internationally.

3.     Sixteen of Renaissance's designs, all of which are registered in Renaissance's name at the United States Copyright Office, are the subject of this lawsuit for copyright infringement by defendants S&H Rugs, Inc., and its owner, President and sole shareholder, Ori Wilbush.

4.     The Amended Complaint charges defendants with infringing plaintiff's copyrights in the sixteen designs, by importing, advertising, offering for sale, and selling rugs whose designs are substantially similar to plaintiff's designs.

5.     Defendants have given notice of their intent to offer the testimony of David Castriota, a university professor of ancient art and archeology, who specializes in the classical period from ancient Egypt through Rome and the barbarians. Although this case is about copyrights in French carpet design from a much later era, Prof. Castriota admitted he has no expertise in either French carpet design, or French design generally, or about copyright. His qualification for this task, he professes, is "a natural visual acuity" – good eyesight – an area squarely within the exclusive province of the jury. Despite his lack of relevant expertise,

2

1218708.1

his report and his proposed testimony consist of a series of comparisons among plaintiff's, defendants' and historical images to determine their similarities and differences.

6.  As discussed in plaintiff's accompanying memorandum of law, neither similarity nor copyrightability is an appropriate subject for expert testimony. Moreover, these are areas in which Prof. Castriota has no special knowledge. Not surprisingly, his own report states that it is not to be relied upon for any purpose other than valuation (which is not an issue in this case) and affirms explicitly that it is not to be deemed an opinion regarding issues of authority, genuineness or provenance (which may be).

7.  Equally telling, Prof. Castriota's "methodology" – if looking at designs as any layperson can do may be considered a methodology – is based on no scientific or specialized knowledge, rests on no research, and is rife with sloppiness and mistakes for which Prof. Castriota apologized at his deposition on over a dozen occasions. Astonishingly, he never looked at the rugs in issue, relying instead on photographs he himself described as "lousy," "disgraceful" and of "very, very poor quality." His resulting opinions are unreliable, unsuitable, incredible and inadmissible.

### Professor Castriota's Lack of Qualifications

8. Prof. Castriota's resume is attached hereto as Exhibit 1. It reflects his training in the art of antiquity, his degrees in classical languages, art and archaeology, and his teaching and writings in the field of ancient art. It contains no hint of expertise in carpet design, French decorative arts, or indeed, anything other than the classical period that precedes the period at issue in this case by two thousand years.

9. Relevant portions of Prof. Castriota's deposition testimony are attached hereto as Exhibit 2. In them, he admits that he has no expertise in French carpet design,[1] or French design generally.[2] He has never studied French carpet design[3] or French decorative arts in the relevant period,[4] teaches nothing relevant,[5]

---

[1] Q. French carpet design is a field, though, right?
A. Yes.
Q. And you're not an expert in that field?
A. No. (Ex. 2, p. 268).

[2] Q. You have identified yourself as an expert in French design here. And I am –
A. No, I have not.
Q. – just testing your expertise?
A. I did not. I did not identify myself as an expert in French design. (*Id.*, p. 104).

[3] Q. And at no point, either as an undergraduate or a graduate student did you study French carpet design?
A. No. (*Id.*, p. 92).

[4] Q. Any courses in French decorative arts in the 18th and 19th centuries?
A. No. (*Id.*, p.89).

has published nothing relevant,[6] and has never lectured about French carpets.[7] He is in fact not even familiar with the literature of French decorative arts generally.[8] His experience has nothing to do with the originality of designs.[9]

10.   Nor does Prof. Castriota claim to be an expert in copyright law, or even familiar with it. He admitted, "I can't talk in a copyright sense,"[10] "I can't make a legal claim,"[11] and "I can't answer whether its copyrightable, because I don't know about copyright law."[12] Though his report comments on the validity of Plaintiff's copyrights, he renounced all such opinions at his deposition. It is apparent from his ill-informed discussion of copyright law, including his

---

[5] Q. I see that you are presently professor at Sarah Lawrence College and it lists teaching undergraduate courses in ancient art and archeology. Do you teach any courses having to do with French carpets?
  A. No, I don't. (*Id.*, p. 145).
[6] Q. Have you published anything on French carpets?
  A. No. (*Id.*, p. 124).
[7] Q. Have you lectured on French carpets?
  A. No. The lectures that I did are on Oriental carpets. (*Id.*).
[8] Q. If I broaden the category to be all French 18th century decorative arts, any difference in your answer?
  A. No. I'm not familiar with the bibliography of 18th century French decorative art generally. (*Id.*).
[9] Q. There is no mention made here about your expertise in the field of originality of design. Is it fair to say that your previous experience have not involved questions of the originality of designs?
  A. Right. They didn't used to ask me to do that. (*Id.*, p. 148).
[10] *Id.*, p. 264.
[11] *Id.*, p. 322.
[12] *Id.* p. 192.

1218708.1

references to the standard for the protectability of inventions, that he was right to disclaim legal knowledge.[13]

11. Neither does Prof. Castriota have any experience as an expert witness. He has never appeared in court,[14] and has appeared at only one deposition in his entire career.[15] Though he investigates accidents for insurance purposes on behalf of O'Toole-Ewald Art Associates,[16] he has never before been retained by that firm to give an opinion in a copyright case.[17]

12. Aside from his lack of general knowledge in this area, Prof. Castriota is ignorant of specific facts that might relate to this case. He is unfamiliar with

---

[13] *E.g., id.*, pp. 344-45: Q. So anyplace in this report that talks about "copyright," you don't stand behind any . . .
A. I did not to –
Q. – Any of your conclusions about copyright?
A. – mean to leave that in, as I said earlier. (*See also id.*, p. 24).
[14] *Id.*, p. 87.
[15] *Id.*, pp. 86-87.
[16] "My role is to see whether the damage that has been done to the rugs is consistent with the circumstances described for the accident." (*Id.*, p. 149)
[17] Q. And this case is not the sort of thing you had been doing with them previously?
A. No, not –
   MR. CURRO [Defendants' counsel]: Objection.
A. – with O'Toole-Ewald.
Q. Had you been doing this kind of case with anyone else before?
A. No. (*Id.*, p. 16).

design features of Louis Philippe rugs,[18] and he did no research in preparing his report.[19] He was even unfamiliar with "one of the most famous carpets of its kind in the world" in this style.[20]

13. Unfamiliar with these critical facts, having no relevant credentials, and having done no research, the only skill Prof. Castriota claims to bring is "a natural visual acuity,"[21] a capability that the law in copyright cases wisely leaves to the determination of the ordinary observer. Prof. Castriota himself acknowledged when pressed that similarities can be "clear to anybody who compares one to the other,"[22] which even "an untutored eye can see."[23] He was

---

[18] Q. How many other Louis Philippe rugs share the features that you identify as being common here between the Renaissance and the Christie's and the Ader-Tajan?
 A. I'm not sure. We did not – we did not extend, we didn't make this an analysis of Louis Philippe designs.
 Q. Could it be that all those correspondences are common to a great many Louis Philippe rugs, and that any rug in the Louis Philippe style –
 A. I couldn't say.
 Q. – might exhibit those correspondences? You couldn't say?
 A. I couldn't say. (*Id.*, p. 339).
[19] Q. Because you didn't do that research?
 A. There was no time to do that research. (*Id.*)
[20] *Id.*, pp. 236-37.
[21] A. ...I have, I think, a natural vision acuity, which is one of the things that made me become an art historian, allowed me – enabled me to get to be an art historian. (*Id.*, pp. 162-163).
[22] A. It was clear to me. It is clear to anybody who –
 Q. So –
 A. – compares one to the other that they are very, very similar. (*Id.*, p. 255).

unwilling to say that his ability in this regard was greater than any layperson's.[24] Asked, "could any layperson reach the same conclusions just as well as you could," he responded, "I think that they might well be."[25]

**Express Limitations of Professor Castriota's Opinions**

14.     Prof. Castriota's expert report is attached hereto as Exhibit 3. His cover letter, pages I and II of the report, describes the report's scope. Consistent with his prior service as an insurance claims investigator, the letter makes clear that the sole purpose of his report, and the only opinions it warrants, relate to the value of carpets. It says, "This appraisal has been provided for fair market value purpose to the McDaniel Law Firm, PC, [Defendants' counsel] and *cannot be used or relied upon for any other purpose*."[26] A separate letter, retaining the O'Toole-Ewald firm that employed Prof. Castriota, and describing the scope of the retainer, makes explicit that it is not "an opinion, statement, representation or warranty with respect to the authenticity of authorship, period of creation, description,

---

[23] A. ...Anyone can see the correspondence, even an untutored eye can see the correspondence between these two forms. (*Id.*, p. 257).
[24] A. ...I think I'm capable of recognizing something that is more probable and less probable and the basis of the facts that we have.
   Q. Anymore so than any layperson?
   A. Possibly. I couldn't say. (*Id.*, p 162).
[25] *Id.*, p. 204.
[26] Exhibit 3, p. II (emphasis supplied).

genuineness, attribution, provenance, title or condition of the Property."[27] Testifying about his report and its purpose, Prof. Castriota confirmed that it is limited to an opinion on valuation.[28]

**Professor Castriota's Flawed "Methodology"**

15. Prof. Castriota did no research for his report,[29] because he found it "very tedious,"[30] and "I really didn't want to be involved in doing that."[31] Defendants, it appeared, brought in "another rug expert"[32] to do research, but did not disclose his identity in the report, or identify him as a witness. Prof. Castriota himself never met him and did "not really" communicate with him,[33] because "he is very very difficult to reach."[34] Prof. Castriota does not know what materials that

---

[27] The "Property" is defined as the Renaissance and S&H rugs at issue in this action. The letter is attached to this affidavit as Exhibit 4.
[28] A. Are you asking me does this document talk about the purpose of the report as anything other than ascribing a value to something? (Witness reviewing document.)
  A. I don't see it. (Exhibit 2, p. 177).
[29] *Id.*, p. 224.
[30] *Id.*, p. 37.
[31] *Id.*, p. 38.
[32] *Id.*
[33] *Id.*, p. 39.
[34] *Id.*

person reviewed,[35] or where they came from.[36] "That was not my job," he testified.[37]

16. Astoundingly, Prof. Castriota did not even look at the rugs that he purports to compare. Instead, he worked from photographs provided to him by Defendants, which he described as of "very, very poor quality."[38] Lest he leave any doubt about that quality, he proceeded to call the images "crummy,"[39] "lousy"[40] and "disgraceful."[41] They were so bad, in fact, he said it was "difficult to see the details."[42]

17. Though Prof. Castriota went ahead and prepared a report based on these "disgraceful" images, he readily acknowledged that it was a violation of proper methodology to do so. "I immediately asked [to see the rugs] at the outset," he testified.[43] "[I]t is a rule, it is a standard operating procedure."[44]

---

[35] *Id.*, p. 181.
[36] *Id.*, p. 224.
[37] *Id.*, p. 237.
[38] *Id.*, p. 305.
[39] *Id.*, p. 317.
[40] *Id.*
[41] *Id.*, p. 327.
[42] *Id.*, p. 18. Prof. Castriota didn't even give careful attention to some of the "crummy" images he did have, because "I had them briefly. They went through my hands like grains of sand." (*Id.*, p. 336).
[43] *Id.*, pp. 404-05.
[44] "I think it is just 'di rigueur' [sic], it is a rule, it is a standard operating procedure. It is the first thing that I want to do." (*Id.*, p. 405).

1218708.1

18. Prof. Castriota testified that though he asked to see the rugs, he was told "Defendants' carpets were inaccessible and no longer existed."[45] If that is what Defendants said, it is false, because Defendants, compelled by the Magistrate Judge's order, issued over their objection, showed Plaintiff the disputed rugs in their inventory, *at the very time that Prof. Castriota was asking for them and was being told they no longer existed.*

19. Given all these flaws in Prof. Castriota's analysis, it is no surprise that he is unaware of his "methodology" ever having been used in a copyright infringement case.[46]

**Professor Castriota's Sloppiness and Mistakes**

20. On top of all its other defects, Prof. Castriota's analysis is rife with sloppiness and mistakes. He himself admitted numerous mistakes, including mixing up two designs,[47] using an image that was not part of the case,[48] and

---

[45] "I was told that Defendants' carpets were inaccessible and no longer existed.
Q. So you were not able to look at any carpets –
A. Never.
Q. – directly?
A. Never. Not once.
Q. Not S&H, not Renaissance?
A. It's the first thing. It's the first thing I asked about." (*Id.*, pp. 64-65).
[46] "I don't know about copyright infringement cases," he added. *Id.*, p. 220.
[47] A. "Honestly, I confess to have made a mistake. I may have inverted both of these. I may have gotten mixed up in that." (*Id.*, p. 284).

1218708.1

relying on another image that was not in his report.[49] The index to his deposition transcript reflects that he "apologized" eleven times for his mistakes,[50] not counting the times he said he was "sorry"[51] for his errors, or was "remiss,"[52] not careful enough,[53] or even "naughty."[54] He pleaded for sympathy for his many mistakes,[55] blaming them variously on failure to read his own words,[56] bad editing,[57] or, on several occasions, on the influence of lawyers.[58]

---

[48] A. "Oh, no. No. I'm sorry. I'm – you know, what, now I understand the confusion. I apologize. Let me explain. This is one of the rugs that was involved in the other case...." (*Id.*, p. 285).

[49] "...I had seen another rug of this design that was not a Renaissance rug." (*Id.*, p. 329).

[50] *Id.*, index p. 2.

[51] *Id.*, pp. 285, 344, 384, 411.

[52] *Id.*, pp. 383, 388.

[53] *Id.*, pp. 165, 175, 407.

[54] Testifying about some of the images, Prof. Castriota inquired, seemingly of no one in particular, "Was I naughty to write this?," to which his attorney responded, "Yes, you were." (*Id.*, p. 332).

[55] "I'm pleading and trying to explain away why I don't catch [my mistakes]. In the end, the responsibility is mine. *Id.*, p. 411.

[56] *Id.*, pp. 165, 175, 407.

[57] A. "That is a mistake on my part that I should have – I thought I excised every example of that." (*Id.*, p. 313).

[58] "I was under the influence of a lawyer who was saying, well, between the two of us, we can make a statement like that" (*id.*, p. 342); in light of the lawyer's opinion, "I revised my opinion accordingly" (*id.*, pp. 225-26); "I was first instructed [by a lawyer] to use language like that." (*id.*, p. 322).

12

## **Conclusion**

21. At the end of the day, Prof. Castriota himself confessed the limited worth of his own opinion. "[I]f you get three experts together, you'll get five opinions," he said. "It is like rabbis, as the old saying goes."[59]

22. That is why determinations of this sort are made by juries, not by partisan "experts" who are unqualified, use no recognizable methodology, do no research, don't even look at the designs at issue, and end up apologizing for their own work.

23. For all these reasons, and for those discussed in Plaintiff's memorandum of law, Prof. Castriota's testimony should be precluded.

_____
Ronald W. Meister

---

[59] *Id.*, p. 349.